## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GLEN L. BRAWLEY, DMD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:17-CV-1513-UJB-VEH** |
| | ) | |
| **NORTHWESTERN MUTUAL LIFE** | ) | |
| **INSURANCE COMPANY, JACK** | ) | |
| **WRIGHT, and ROBERT F. KERR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Plaintiff Glen L. Brawley ("Dr. Brawley") originally filed this insurance action in the Circuit Court of Jefferson County, Alabama, on August 1, 2017. (Doc. 1-1 at 8).[1] Dr. Brawley claims that he is disabled and can no longer work as an orthodontist. His case against Northwestern Mutual Life Insurance Company ("Northwestern") and two resident insurance agents–Jack Wright ("Dr. Wright") and Robert F. Kerr ("Dr. Kerr")–stems from a denial of long-term disability benefits sought by Dr. Brawley under several different disability policies.

---

[1] All page references to Doc. 1-1 correspond with the Court's CM/ECF numbering system.

Dr. Brawley's lawsuit contains 6 separate counts. Count One is for breach of contract against Northwestern only. Count Two is for fraud in the inducement against all three Defendants. Count Three is for negligent and/or wanton training and supervision against Dr. Wright and Northwestern. Count Four is for suppression against all three Defendants. Count Five is for bad faith against Northwestern. Finally, Count Six is for negligent procurement and failure to notify against Messrs. Kerr and Wright.

Northwestern removed this litigation to this Court on September 6, 2017, asserting diversity under 28 U.S.C. § 1332 as the basis for federal jurisdiction. (Doc. 1 at 1). Critical to its Notice of Removal on diversity grounds, Northwestern contends that Messrs. Kerr and Wright have been fraudulently joined by Dr. Brawley and, as a result, their presence in the lawsuit cannot defeat jurisdiction under § 1332. (Doc. 1 at 4 ¶ 11). Consistent with Northwestern's fraudulent joinder allegations, Messrs. Kerr and Wright have filed a Motion To Dismiss (doc. 8) (the "Dismissal Motion"). Dr. Brawley opposed the Dismissal Motion on October 6, 2017. (Doc. 12).

The Court also has before it Dr. Brawley's Motion To Remand (doc. 11) (the "Remand Motion") filed on October 6, 2017. Northwestern filed its opposition (doc. 17) to Dr. Brawley's Remand Motion on October 27, 2017, and Dr. Brawley followed with his reply (doc. 18) on November 10, 2017. Because the Court concludes that

Messrs. Kerr and Wright have been fraudulently joined, complete diversity does exist in this case. Consequently, the Remand Motion is **DENIED**, and the Dismissal Motion is **GRANTED**.

## II. Dr. Brawley's Allegations Against Messrs. Kerr and Wright

### A. Dr. Brawley's Purchase of Five Northwestern Disability Policies

Dr. Brawley asserts that Mr. Kerr "was a special agent of Northwestern, and subject to the control of both Northwestern and [Mr.] Wright." (Doc. 1-1 at 9 ¶ 4). Mr. Wright "was the Northwestern general agent responsible for training, supervision and conduct of Special Agent [Mr.] Kerr." (*Id.* ¶ 3).

Dr. Brawley purchased his first disability policy from Northwestern through an agent other than Mr. Kerr or Mr. Wright. (Doc. 1-1 at 9 ¶ 7). That first policy, number D-216-477, was issued on April 10, 1981 (the "1981 Policy").[2] *Id.* Prior to purchasing the 1981 Policy, Dr. Brawley explained to the agent that he "wanted what is referred to as an 'own occupation' policy that would pay benefits if he became disabled and unable to perform as a specialist in orthodontics." (Doc. 1-1 at 9-10 ¶ 7). The 1981 Policy "remained in full force and effect until April 10, 2017, long after [Dr. Brawley] became disabled." (*Id.* at 10 ¶ 7).

---

[2] Dr. Brawley asserts no claims against the agent who sold him this 1981 Policy. Mr. Kerr sold Dr. Brawley the remaining four Northwestern policies.

After the purchase of the 1981 Policy, Dr. Brawley "began developing a business rapport in 1987" with Mr. Kerr when he "became [Dr. Brawley]'s Northwestern agent for disability insurance." (Doc. 1-1 at 10 ¶ 8). Dr. Brawley and Mr. Kerr met in October of 1987 to discuss Dr. Brawley's disability insurance needs. (*Id.* ¶ 9).

Dr. Brawley claims that Mr. Kerr "represented to [him] that Northwestern's policies were the top of the line and true 'own occupation' policies in the sense that [Dr. Brawley] would receive disability benefits if he could not perform, on a full time basis, the primary activities of his specific specialty (orthodontics) – that is, the physical activities performed by orthodontists on a routine and daily basis (*i.e.*, bending wire)[.]" (Doc. 1-1 at 10 ¶ 10). This assurance was vital to [Dr. Brawley] because he was developing a very demanding and successful specialty practice …." (*Id.* at 10-11 ¶ 10).

Mr. Kerr recommended that Dr. Brawley purchase a second Northwestern disability policy. (Doc. 1-1 at 11 ¶ 11). Dr. Brawley agreed and the second policy, number D-560360, was issued on November 10, 1987 (the "1987 Policy"). *Id.* The 1987 Policy "remained in full force and effect until April 10, 2017, long after [Dr. Brawley] became disabled." *Id.*

In December of 1989, Mr. Kerr and Dr. Brawley met again to discuss Dr.

Brawley's disability insurance needs. (Doc. 1-1 at 11 ¶ 12). Because Dr. Brawley's "practice-based income had increased," Mr. Kerr recommended a corresponding adjustment to Dr. Brawley's monthly benefit. *Id.* Mr. Kerr further indicated that the proposed policy was "virtually identical to his previous Northwestern policies in terms of its definition of 'total disability.'" *Id.* Dr. Brawley accepted Mr. Kerr's recommendation and the third policy, number D-727-724, was issued on January 10, 1990 (the "1990 Policy"). *Id.* The 1990 Policy "remained in full force and effect until April 10, 2017, long after [Dr. Brawley] became disabled." (*Id.* at 12 ¶ 12).

In March of 2002, Mr. Kerr and Dr. Brawley met again to discuss Dr. Brawley's disability insurance needs. (Doc. 1-1 at 12 ¶ 13). Because of the continued growth of Dr. Brawley's practice, Mr. Kerr again recommended a corresponding adjustment of Dr. Brawley's monthly benefit, but this time he proposed that Mr. Kerr purchase two policies. *Id.* Mr. Kerr "confirmed that the policies he was recommending were essentially the same as the prior policies." *Id.* "Again, [Dr. Brawley] accepted [Dr.] Kerr's recommendation and "the fourth and fifth policies, numbers D1-451-476 and D1-451-480, were issued on March 10, 2002 (the '476 Policy' and '480 Policy' respectively, and collectively, the '2002 Policies')." (*Id.* at 12 ¶ 14). The 2002 Policies "remained in full force and effect until April 10, 2017, long after [Dr. Brawley] became disabled." *Id.*

"Based on [Mr.] Kerr's representation that the two new policies were essentially the same as the three previous policies, and the relationship of trust [that] had developed between [Dr. Brawley] and [Mr.] Kerr over the years, [Dr. Brawley] did not compare the exact language of the two new policies with that of the three previous policies. (Doc. 1-1 at 12 ¶ 15 (emphasis added)). "Unbeknownst to [Dr. Brawley], the definition of total disability in the two new policies added a provision to the definition that [did not appear] in the three previous policies." (*Id.* at 12-13 ¶ 15).

The new provision stated that:

If the Insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled; however, the Insured may qualify as partially disabled.

(*Id.* at 13 ¶ 15).

Concerning Dr. Brawley's purchase of the multiple Northwestern policies, Dr. Brawley further asserts:

17.    At no time did [Mr.] Kerr, or any other Northwestern agent, including [Mr.] Wright, ever disclose the following facts to [Dr. Brawley]:

a.    That Northwestern would not pay any disability benefits so long as [Dr. Brawley] could perform incidental and insignificant duties of his specialty, even if he could not perform the most significant activity or activities of his specialty;

6

b.      That Northwestern would deny an insured orthodontist's disability claim even if said specialist could not perform the work within his specialty;

c.      That Northwestern would deny an insured orthodontist's disability claim even if said specialist could only work 18 hours per week in his specialty;

d.      That Northwestern would deny an insured orthodontist's disability claim even if said specialist could only perform a few of the procedures within his specialty, so long as he could still supervise technicians, prepare treatment plans and/or perform administrative work.

e.      That, after 1989, Northwestern incurred excessive losses in claims on policies like [Dr. Brawley]'s first three policies, and subsequently changed its policies to where it would deny disability claims as long as an orthodontist could teach, prepare treatment plans, supervise technicians or perform administrative work, even though said specialist was unable to regularly perform the significant procedures within his specialty;

f.      That once a disability claim was filed, Northwestern would ignore statements from its insured orthodontist about the level of pain he experienced while performing repeated orthodontic procedures;

g.      That Northwestern would not pay partial disability benefits if an insured orthodontist could only perform orthodontist procedures for 18 hours per week;

h.      That, during the claims process, Northwestern would "cherry-pick" certain information (or select bits and pieces of information) from the insured orthodontist's medical record and/or the reports of its paid experts that might support a claim denial, and then rely on that information to

deny a claim while refusing the insured access to the potentially negative information so that he could respond to []it;

i.      That, during the claims process, Northwestern would "cherry-pick" certain information (or select bits and pieces of information) from the insured orthodontist's medical record and/or the reports of its paid experts that might support a claim denial, and then refuse the insured access to parts of the paid expert reports supporting a disability claim;

j.      That, during the claims process, Northwestern would rely on a 3-4 hour Functional Capacity Evaluation ("FCE") to deny claims submitted by an insured orthodontist, despite the fact that the insured's disability was based, in large part, not only on increased paid and fatigue as a single work day progressed, but also chronic pain and fatigue as consecutive days of work accumulated[;]

k.      That, during the claims process, Northwestern would ignore evidence from its own independent medical examiners supporting disability if it could find an internal "specialist" who would support a claim denial;

i.      That because Northwestern chose not to define the phrase "principal duties" in its disability policies, and because it ignored the insured's own statement of his principal duties in his application, Northwestern considered itself free to deny claims so long as the insured was still capable of performing some duty of his pre-disability occupation.

(Doc. 1-1 at 12-15 ¶¶ 13-17).

**B.      Dr. Brawley's Injury and Processing of His Disability Benefits Claim**

"On February 5, 2013, [Dr. Brawley] was involved in a brush saw accident" and suffered a severe injury of his right hand that required surgery. (Doc. 1-1 at 15 ¶ 19). Due to the work-related impact of this injury, Dr. Brawley filed a disability claim with Northwestern on February 21, 2013, under all of five policies. (*Id.* at 20 ¶ 34).

As for the claims process, Dr. Brawley alleges that Northwestern first denied his claim for disability benefits on February 25, 2015 (doc. 1-1 at 21 ¶ 40), but that he appealed that denial on March 20, 2015. (*Id.* ¶ 41). The record confirms that Northwestern's February 25, 2015, correspondence advised Dr. Brawley that he had a 30-day window to file an appeal:

> If you disagree with this decision and want to appeal it, please submit within 30 days any information or documentation that you would like for us to consider and that you believe supports your decision.

(Doc. 1-2 at 126).[3]

In Dr. Brawley's appeal letter,

> [Dr. Brawley] also requested that Northwestern provide him with copies of the documentation that it relied on in denying his claim, so that he could respond fully to the allegations and comments allegedly contained therein. On or about March 24, 2015, Northwestern wrote [Dr. Brawley] a letter in which it refused to produce the requested documentation. Following the letter, [Dr. Brawley] made numerous phone calls to Northwestern, to learn what action it was taking, but heard nothing.

---

[3] All page references to Doc. 1-2 correspond with the Court's CM/ECF numbering system.

Finally, on or about April 28, 2015, [Dr. Brawley] was told that he needed to file a written request "to move forward with the appeal," which he did on April 29, 2015.

(Doc. 1-1 at 21 ¶ 41 (footnote omitted)).

After sending Northwestern confirmation "to move forward" on April 29, 2015, Dr. Brawley allegedly made "numerous phone calls seeking information about the status of his appeal[.]" (Doc. 1-1 at 21 ¶ 42). "Northwestern did not respond to [Dr. Brawley] until December 23, 2015, approximately eight months after his appeal was filed" and "reiterated Northwestern's claim denial . . . ." (*Id.* at 21-22 ¶ 42).

Subsequent to receiving the December notice denying his appeal, Dr. Brawley "submitted a 3-page letter to Northwestern, along with a new Request for Disability Benefits under all five of his Northwestern disability policies" on March 27, 2016. (Doc. 1-1 at 22 ¶ 43). Northwestern followed with a letter on June 15, 2016, "den[ying] any disability benefits to [Dr. Brawley]." (*Id.* ¶ 44 (emphasis omitted)).

Dr. Brawley "continued pursuing his appeals and making numerous phone calls to Northwestern to determine its final decision." (*Id.* ¶ 45). At some point after a telephone conversation with Northwestern that occurred on October 7, 2016, Dr. Brawley "received notice that Northwestern would not pay him any benefits beyond which it had already paid." (Doc. 1-1 at 23 ¶ 45).

## III. Standards

## A.    General Jurisdictional Principles

"It is by now axiomatic that the inferior courts are courts of limited jurisdiction. They are 'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress." *Univ. of S. Ala. v. The Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)). "Accordingly, '[w]hen a federal court acts outside its statutory subject-matter jurisdiction, it violates the fundamental constitutional precept of limited federal power.'" *Univ. of S. Ala.*, 168 F.3d at 409 (quoting *Marathon Oil Co. v. Ruhrgas*, 145 F.3d 211, 216 (5th Cir. 1998) (en banc) (citing another source), *reversed on other grounds by Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 588, 119 S. Ct. 1563, 1572, 143 L. Ed. 2d 760 (1999)). "Simply put, once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." 168 F.3d at 410.

"A necessary corollary to the concept that a federal court is powerless to act without jurisdiction is the equally unremarkable principle that a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." *Id.* "Indeed, it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Id.* (citing

*Fitzgerald v. Seaboard Sys. R.R.*, 760 F.2d 1249, 1251 (11th Cir. 1985) (per curiam)).

Additionally, "[t]he jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case, and cannot be waived or otherwise conferred upon the court by the parties. Otherwise, a party could 'work a wrongful extension of federal jurisdiction and give district courts power the Congress denied them.'" *Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1000-01 (11th Cir. 1982) (quoting *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 18, 71 S. Ct. 534, 542, 95 L. Ed. 702 (1951)) (internal footnote and citation omitted). Furthermore, "[b]ecause removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly." *Univ. of S. Ala.*, 168 F.3d at 411 (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09, 61 S. Ct. 868, 872, 85 L. Ed. 1214 (1941)).

Lastly, Congress has decreed and the Supreme Court has confirmed that–with the limited exceptions of lawsuits brought against federal officers or agencies (28 U.S.C. § 1442) and civil rights cases (28 U.S.C. § 1443) that have been removed–orders of remand by district courts based upon certain grounds, including in particular those premised upon lack of subject matter jurisdiction, are entirely insulated from review. More specifically, § 1447(d) provides:

An order remanding a case to the State court from which it was removed

is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

28 U.S.C. § 1447(d) (emphasis added); *see also Kirchner v. Putnam Funds Trust*, 547 U.S. 633, 642, 126 S. Ct. 2145, 2154, 165 L. Ed. 2d 92 (2006) (recognizing that "'[w]here the [remand] order is based on one of the grounds enumerated in 28 U.S.C. § 1447(c), review is unavailable no matter how plain the legal error in ordering the remand'") (quoting *Briscoe v. Bell*, 432 U.S. 404, 413 n.13, 97 S. Ct. 2428, 2434 n.13, 53 L. Ed. 2d 439 (1977)); Milton I. Shadur, *Traps for the Unwary in Removal and Remand*, 33 no. 3 Litigation 43 (2007); *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 234, 127 S. Ct. 2411, 2418, 168 L. Ed. 2d 112 (2007) (holding that when "the District Court relied upon a ground that is colorably characterized as subject-matter jurisdiction, appellate review is barred by § 1447(d)").

### B.    Diversity Jurisdiction

Northwestern premises its removal upon this Court's diversity jurisdiction. "Diversity jurisdiction exists where the suit is between citizens of different states and the amount in controversy exceeds the statutorily prescribed amount, in this case $75,000." *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) (citing 28 U.S.C. § 1332(a)). Therefore, removal jurisdiction based upon diversity requires: (1) complete diversity of citizenship between the plaintiff(s) and the defendant(s); and

(2) satisfaction of the amount-in-controversy requirement.[4]

### 1.    Citizenship Requirement

Diversity jurisdiction "requires complete diversity—every plaintiff must be diverse from every defendant." *Palmer v. Hosp. Auth.*, 22 F.3d 1559, 1564 (11th Cir. 1994). "Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person." *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994). Although Dr. Brawley has sued fictitious parties, "[f]or purposes of removal…the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(b)(1).

### 2.    Fraudulent Joinder Principles

The dispute over satisfaction of the citizenship requirement in this case has to do with whether Dr. Brawley has fraudulently joined the non-diverse Defendants, Messrs. Kerr and Wright. "[W]hen there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant[,]" fraudulent joinder is established. *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). Relatedly, if fraudulent joinder is established, then the resident defendant is

---

[4] Dr. Brawley has not contested satisfaction of the amount-in-controversy threshold. Moreover, the Court has studied Northwestern's Notice of Removal and finds that Northwestern has satisfied its burden as to that component given the estimated value of past due disability benefits owed to Dr. Brawley in the amount of $437,440. (*See* Doc. 1 at 10 ¶ 25 (citing *Thomas v. Travelers Ins. Co.*, 154 F. 2d 950, 951 (5th Cir. 1946)).

subject to dismissal as a party and its citizenship is disregarded for diversity requirement purposes. *See id.*

The Eleventh Circuit extensively addressed diversity-based removal when the removing party maintains that a non-diverse defendant has been fraudulently joined in *Crowe v. Coleman*, 113 F.3d 1536 (11th Cir. 1997). There the court stated:

> In a removal case alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court. *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989). The burden of the removing party is a 'heavy one.' *B, Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. Unit A 1981).

*Crowe*, 113 F.3d at 1538.[5]

The standard is onerous because, absent fraudulent joinder, a plaintiff has the absolute right to choose his forum. That is, courts must keep in mind that the plaintiff is the master of his complaint and has the right to choose how and where he will fight his battle. As *Crowe* further recognized:

This consequence makes sense given the law that "absent fraudulent

---

[5] Under the second prong of the fraudulent joinder test, the Court must determine whether the plaintiff has fraudulently pled facts relating to a party's citizenship in an effort to avoid diversity jurisdiction. No issue related to the second prong exists in this case. A third category–when "the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant[,]" *Triggs,* 154 F.3d at 1287, is also not applicable. Accordingly, the Court limits its analysis to the first prong–whether Northwestern has shown that there is no possibility that Dr. Brawley can establish a cause of action against Mr. Kerr or Mr. Wright.

joinder, plaintiff has the right to select the forum, to elect whether to sue joint tortfeasors and to prosecute his own suit in his own way to a final determination." *Parks v. The New York Times Co.*, 308 F.2d 474, 478 (5th Cir. 1962). The strict construction of removal statutes also prevents "exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked jurisdiction on removal," *see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc.*, 507 F. Supp. 740, 744 (S.D. Ga. 1981) (quoting 14A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedures* § 3721), a result that is costly not only for the plaintiff, but for all the parties and for society when the case must be re-litigated.

*Crowe*, 113 F.3d at 1538.

To establish fraudulent joinder of a resident defendant, the burden of proof on the removing party is a "heavy one[,]" *see Crowe*, 113 F.3d at 1538 (internal quotation marks omitted) (quoting *Miller Brewing*, 663 F.2d at 549), requiring <u>clear and convincing evidence</u> and <u>particularity in pleading</u>. *Parks*, 308 F.2d at 478. Although affidavits and depositions may be considered, the Court must not undertake to decide the merits of the claim but must look to whether there is a <u>possibility</u> that a claim exists. More particularly, the *Crowe* court explained the framework for analyzing fraudulent joinder as:

> While 'the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under FED. R. CIV. P. 56(b),' [*Miller Brewing*, 663 F.2d at 549 n.9], the jurisdictional inquiry 'must not subsume substantive determination.' *Id.* at 550. Over and over again, we stress that 'the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits.' *Id.* at 548-49. When considering

a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law. *See id.* '<u>If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court</u>.' *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440-41 (11th Cir. 1983), *superseded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533 (11th Cir. 1993).

*Crowe*, 113 F.3d at 1538 (emphasis added).

In a later fraudulent joinder decision, the Eleventh Circuit elaborated:

The fact that the plaintiffs may not ultimately prevail against the individual defendants because of an insufficient causal link between the defendants' actions and the plaintiffs' injuries does not mean that the plaintiffs have not stated a cause of action for purposes of the fraudulent joinder analysis. In a fraudulent joinder inquiry, '<u>federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law</u>.' *Crowe*, 113 F.3d at 1538.

*Pacheco de Perez v. AT & T Co.*,139 F.3d 1368, 1380-81 (11th Cir. 1998) (emphasis added); *see also Tillman v. R.J. Reynolds Tobacco*, 340 F.3d 1277, 1279 (11th Cir. 2003) ("[I]f there is a possibility that a state court would find that the complaint states a cause of action against any of the resident defendants, the federal court must find that the joinder was proper and remand the case to state court.").

## IV.    Analysis

Against the foregoing backdrop, the Court now addresses the application of the fraudulent joinder standard to this case. The Court begins with Northwestern's rule-

of-repose contentions.

A. **Alabama's Rule of Repose Bars All Tort Claims Against Messrs. Kerr and Wright under the 1987 and 1990 Policies.**

Northwestern's opening position in opposition to the Remand Motion is that the rule of repose precludes all of Dr. Brawley's fraud and negligence claims against Messrs. Kerr and Wright connected to his 1987 and 1990 Policies. (Doc. 17 at 11).[6] Northwestern further contends that "the application of the rule of repose leaves no doubt that [Dr. Brawley]'s hopes of sustaining any claims against [Messrs.] Wright and Kerr <u>necessarily hinge on the sale of the 2002 Policies</u>." (Doc. 17 at 13 (emphasis added)). The Court agrees.

As explained in *Am. Gen. Life & Acc. Ins. Co. v. Underwood*, 886 So. 2d 807 (Ala. 2004), Alabama's rule of repose

> "bars actions that have not been commenced within 20 years from the time they could have been commenced." *Tierce v. Ellis*, 624 So. 2d 553, 554 (Ala. 1993). The rule of repose "is not affected by the circumstances of the situation, by personal disabilities, or by whether prejudice has resulted or evidence [has been] obscured." *Boshell v. Keith*, 418 So. 2d 89, 91 (Ala. 1982). "Lack of notice is not sufficient to avert the application of the [rule of repose]." *Ballenger v. Liberty Nat'l Life Ins. Co.*, 271 Ala. 318, 322, 123 So. 2d 166, 169 (1960); *accord Ex parte Liberty Nat'l Life Ins. Co.*, 825 So. 2d 758, 764 (Ala. 2002), and *Ex parte Liberty Nat'l Life Ins. Co.*, 858 So. 2d 950, 957-59 (Ala. 2003) (Johnstone, J., dissenting). "[T]he only element of the rule of repose is time." *Boshell*, 418 So. 2d at 91.

---

[6] All page references to Doc. 17 correspond with the Court's CM/ECF numbering system.

*Underwood*, 886 So. 2d at 812.

The Supreme Court of Alabama further made clear in *Underwood* that, for tort claims tied to insurance policies

> the rule of repose beg[i]ns running on each claim arising from the purchase of a particular policy <u>as soon as the plaintiff pa[ys] the first premium</u> for the policy because that payment supplie[s] the last essential element necessary for all essential elements of the particular claim to coexist so that the plaintiff could file suit.

886 So. 2d at 813 (emphasis added).

Dr. Brawley paid monthly premiums on his 1987 and 1990 Policies and did not initiate his lawsuit until August 1, 2017. Because well over 20 years elapsed between the payment of his first monthly premium for each policy and the filing date of his state court complaint, "the rule of repose barred his claims before he commenced this lawsuit." *Underwood*, 886 at 813.

In reply, Dr. Brawley does not substantively challenge Northwestern's straightforward invocation of the rule of repose or its establishment of fraudulent joinder as to these particular tort claims. Instead, Dr. Brawley points out that any claims attributable to the 2002 Policies are not subject to the rule of repose:

> Although the Parties dispute whether Brawley's tort claims based on the 1987 and 1990 Policies are barred by Alabama's rule of repose, it is undisputed that his fraud and negligence claims regarding the 2002 Policies are not subject to a similar bar. For purposes of remand, Northwestern's rule of repose argument is unavailing because the Parties

agree that at least some of Brawley's tort claims (*i.e.*, the claims based on the 2002 Policies) are not barred by the rule.

(Doc. 18 at 1-2 ¶ 2).

Therefore, on the basis of the rule of repose, the Court finds that Dr. Brawley has no possible (or arguable) claim against Messrs. Kerr and Wright with respect to either the 1987 Policy or the 1990 Policy. Accordingly, the Court turns its focus to the viability of Dr. Brawley's tort claims against these resident Defendants with respect to the 2002 Policies.

### B.   Dr. Brawley's Remaining Fraud Claims against Messrs. Kerr and Wright under the 2002 Policies Are Time-Barred.[7]

Northwestern relies upon the seminal case of *Foremost Ins. Co. v. Parham*, 693 So. 2d 409 (Ala. 1997), and contends that any fraud claims brought against Messrs. Kerr and Wright under the 2002 Policies are time-barred under Ala. Code § 6-2-38. (Doc. 17 at 13). Section 6-2-38 establishes a two-year statute of limitations period for fraud claims. *See* Ala. Code § 6-2-38(*l*) ("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."); *see also* Ala. Code § 6-2-3 ("In actions

---

[7]   Northwestern's statute-of-limitations (and other) contentions in support of fraudulent joinder are not exclusive to the 2002 Policies. However, because the Court has separately found that the rule of repose bars all tort claims against Messrs. Kerr and Wright that are tied to Dr. Brawley's earlier policies, the remainder of this opinion deals only with Dr. Brawley's claims pertaining to the 2002 Policies.

seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.").

In *Foremost*, the Alabama Supreme Court fundamentally modified the reliance standard for fraud claims. More specifically, the *Foremost* court retreated from a subjective viewpoint of justifiable reliance as previously adopted by *Hickox v. Stover*, 551 So. 2d 259 (Ala. 1989), and returned to an objective one of reasonable reliance as "most closely associated with *Torres v. State Farm Fire & Casualty Co.*, 438 So. 2d 757 (Ala. 1983)." *Foremost*, 693 So. 2d at 421; *see id.* (overruling *Hickox*, "to the extent that it changed the law of fraud as it had existed prior there to" and "return[ing] to the reasonable reliance standard").

Of particular concern to the *Foremost* court in returning actionable fraud to a pre-*Hickox* standard was *Hickox*'s "eliminat[ion] [of] the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial)[.]" 693 So. 2d at 421. Additionally, *Foremost* made it clear that a plaintiff is entitled "to rely on a representation only if he fulfills his responsibility, or duty, to exercise ordinary prudence." 693 So. 2d at 438.

Relatedly, the *Foremost* formulation impacted the accrual period for fraud:

The *Foremost* decision reestablished that the objective standard for determining the accrual date for a fraud claim imposes a duty to read documents received in connection with a particular transaction.9 Id. at 421. Therefore, fraud claims accrue upon the earlier of: (1) actual discovery of the alleged fraud; or (2) receipt of a document or contract alerting the plaintiff to the possibility of fraud, if the plaintiff could have read and understood such document and chose to ignore its written terms.

*Owens v. Life Ins. Co. of Georgia*, 289 F. Supp. 2d 1319, 1325 (M.D. Ala. 2003) (footnote omitted); *see also Foremost*, 693 So. 2d at 421 (overruling *Hicks v. Globe Life & Acc. Ins. Co.*, 584 So. 2d 458 (Ala. 1991), "to the extent that it changed the standard that had previously existed for determining the statute of limitations issue in fraud cases"); *Foremost*, 693 So. 2d at 438 ("With respect to the statute of limitations for a fraud claim, the 'reasonable reliance' standard requires the buyer to act reasonably to discover fraud.") (emphasis added).

Consistent with the foregoing framework, Northwestern argues that "the limitations period on [Dr. Brawley]'s fraud claims began to run when he received a copy of his policies." (Doc. 17 at 15). Absent the application of an exception to the *Foremost* accrual rule, that would mean the statute of limitations for Dr. Brawley's fraud claims that are based on his 2002 Policies ran on March 10, 2004.

Indeed, as Northwestern points out, several district courts have applied similar limitations-based reasoning in concluding that the insurance agent who the plaintiff

sued for fraud was fraudulently joined. *See, e.g., Bullock v. United Ben. Ins. Co.*, 165 F. Supp. 2d 1255, 1258 (M.D. Ala. 2001)(finding "no possibility that Plaintiff can establish a cause of action [for fraud] against [the individual defendant]" due to expiration of the 2-year limitations period before commencing lawsuit); *Fowler v. Provident Life & Accident Ins. Co.*, 256 F. Supp. 2d 1243, 1249 (N.D. Ala. 2003) (finding fraudulent joinder because "under the *Foremost* rule, the plaintiff should have discovered the possibility of fraud and misrepresentation in 1992 when she purchased the policy, and the two year statute of limitations commenced running at that time"); *Owens*, 289 F. Supp. 2d 1319, 1326 (finding fraudulent joinder due to expiration of the statute of limitations period when "Plaintiff should have discovered the possibility of fraud and misrepresentation in 1984 when he purchased the Policy"); *cf. also Waldrup v. Hartford Life Ins. Co.*, 598 F. Supp. 2d 1219, 1228 (N.D. Ala. 2008) (determining concealment allegations to be inadequate to invoke Ala. Code § 6-2-3 (the savings provision for fraud) and finding "no possibility that plaintiffs could escape the bar of the statute of limitations").

In reply, Dr. Brawley does not discuss any of these on-point insurance fraud cases. He instead cites to *Mattox v. State Farm Fire & Cas. Co.*, No. CA 12-0192-KD-C, 2012 WL 3870392 (S.D. Ala. Aug. 15, 2012), *report and recommendation adopted*, No. CIV. A. 12-0192-KD-C, 2012 WL 3870495 (S.D. Ala.

Sept. 6, 2012), as a countervailing authority. (Doc. 18 at 2-3 ¶ 3). The problem with

Dr. Brawley's misguided reliance upon *Mattox* is that he falls outside the particular

parameters of that case's holding:

> [N]one of these cases furthers this Court's analysis of the issue because, to the extent each case was decided adversely to the plaintiffs, it was because each plaintiff predicated liability on representations occurring at or around the date of purchase of the policy or annuity when each plaintiff was in possession of documents contradicting the alleged oral misrepresentations or the information allegedly suppressed. . . . Here, of course, liability is not predicated on alleged misrepresentations or suppression of information occurring at or around renewal of the subject policy, but instead, liability is predicated on misrepresentations or suppressions occurring during State Farm's adjustment/handling of plaintiff's claim; therefore, the federal cases relied upon by defendant simply do not foreclose the possibility that in the state courts of Alabama, under the unique circumstances presented here, Mattox can overcome the statute of limitations bar. More importantly, because the removing defendants have not come forward with a federal case finding fraudulent joinder in a situation like the present, where liability is predicated on misrepresentations—or the suppression of information—during the adjustment or handling of a claim, and the Alabama courts post-*Foremost* have signaled that the statute of limitations should be decided as a matter of law only at the summary judgment stage or later, after the close of all discovery, this Court should decline at this point in the proceedings to make such a finding as a matter of law.

2012 WL 3870392, at *18 (emphasis added).[8]  Unlike the plaintiff in *Mattox*, Dr.

---

[8] This Court rejects as inconsistent with the contrary outcomes in *Bullock*, *Fowler*, *Owens*, and *Waldrup*—and inconsistent with the holding in *Foremost*—any argument that the language in *Mattox* can be read more broadly to foreclose a finding of fraudulent joinder whenever that finding is premised upon a statute-of-limitations theory.

Brawley's fraud claims against Messrs. Kerr and Wright are unrelated to the "adjustment or handling of a claim[.]"

Dr. Brawley additionally argues that ambiguity in policy language means that "there is at lease some possibility" that his fraud claims are not time-barred by *Foremost*. (Doc. 18 at 3 ¶ 4). Dr. Brawley is correct that the *Foremost* accrual rule is not absolute. As another judge sitting in this district has observed:

> There are limitations on the *Foremost* rule. An individual is not capable of discovering a fraud or negligent misrepresentation by reading and understanding the terms of a contract if he or she is illiterate, *see Potter v. First Real Estate Co.*, 844 So. 2d 540, 2002 WL 31002850, at *6-7, 2002 Ala. LEXIS 259, at *17-18 (Ala. Sept. 6, 2002) ("It has long been settled law of this State that a party to a contract who is illiterate can allege fraud and thereby overcome the other party's reliance on the terms expressed in the contract.") (citing *Paysant v. Ware*, 1 Ala. 160 (1840)), or if the underlying document is ambiguous, *i.e.*, capable of more than one interpretation, and thus hard to understand, *see Ex parte Seabol*, 782 So. 2d 212, 216-17 (Ala. 2000) (finding that where underlying documents are not easily understood, plaintiff's reliance on oral representation concerning documents is reasonable).

*Fowler*, 256 F. Supp. 2d at 1248 (emphasis added).[9]

However, as stated in his reply brief, the ambiguous language that Dr. Brawley relies upon is the language that he read in his (time-barred) 1987 and 1990 Policies. (Doc. 18 at 3-4 ¶ 4). Any ambiguity in those earlier policies cannot save his fraud claims based on the 2002 Policies that contain different language (which he did not

_____

[9] The illiteracy exception to *Foremost* is not an issue in this case.

read).[10] Furthermore, "[Dr. Brawley] had in h[is] possession documents which contradicted the alleged oral misrepresentations made by [Mr. Kerr] and [which] provided the information allegedly suppressed [about the definition of "total disability" under the 2002 Policies].".*, Bullock*, 165 F. Supp. 2d 1255, 1258. "The fact that [Dr. Brawley] elected not to read [the 2002 Policies] does not toll the statute of limitations." *Id.*

In his reply, Dr. Brawley also cites to the non-insurance case of *Potter v. First*

---

[10] In his Remand Motion, Dr. Brawley cites to *Giddens v. Equitable Life Assur. Soc. of U.S.*, 445 F.3d 1286 (11th Cir. 2006), and argues that the ambiguity in the definition of "total disability" "prevented [him] from discovering the full scope of coverage set forth in the 1987 and 1990 Policies, which he read, just as it would have prevented him from discovering the full scope of coverage set forth in the 2002 Policies, had he read them." (Doc. 11 at 24); (*see also* Doc. 12 at 5-6 ¶ 9 (arguing in opposition to Dismissal Motion that "[b]ecause the policies in [Dr.] Brawley's possession did not 'clearly indicate' that the coverage contained therein was different than what he requested, [Dr.] Brawley cannot be found contributorily negligent as a matter of law")). *Giddens* involves neither fraudulent joinder nor Alabama law. *See id.* at 1297 ("Because this defense is based on the policy language, we first review the Georgia law regarding construction of insurance contracts and then the Policies.").

In any event, the vaguely defined term of "total disability" analyzed in *Giddens* is significantly different than unambiguous provision included in the 2002 Policies by Northwestern. *Compare Giddens*, 445 F.3d at 1297 (explaining that "the Policies define 'Total Disability' as the inability to 'engage in the substantial and material duties of your regular occupation'" and finding that such language is ambiguous because it "does not say 'all' substantial and material duties or 'most' or any percentage"), *with* Doc. 1-1 at 13 ¶ 15 (explaining that in the 2002 Policies if "the Insured can perform <u>one or more</u> of the principal duties of the regular occupation, the Insured is not totally disabled"). Therefore, *Giddens* does not persuade this Court that Alabama's ambiguity exception to *Foremost* applies to the meaning of "total disability" under the 2002 Policies. Additionally, Dr. Brawley has not cited to any Alabama (or other) authority in which the term "principal duties" or other language used to define "total disability" within the 2002 Policies was determined to be ambiguous. Without such a window of possibility, the Court is convinced that no Alabama court would conclude anything but that the definition of "total disability" contained in the 2002 Policies is unambiguous.

*Real Estate Co.*, 844 So. 2d 540 (Ala. 2002), and argues that a special relationship

exception precludes application of the *Foremost* accrual rule, even though he never

read the 2002 Policies. (Doc. 18 at 4-6 ¶¶ 5-6). More specifically, Dr. Brawley states:

> Unlike the 1987 and 1990 Policies, [Dr.] Brawley never read the
> 2002 Policies, specifically because [Mr.] Kerr made added assurances
> to him, on the date of the issuance of the policies, that both were
> essentially the same as Brawley's three previous policies. *See* Doc. 1-1
> at Compl. ¶¶ 13-15. This misrepresentation [by Mr. Kerr], made
> contemporaneously with the issuance of the 2002 Policies, lulled [Dr.]
> Brawley into a false sense of security about the true nature of the
> coverage provided under each. As a result, [Dr.] Brawley never read the
> 2002 Policies, even though he had reviewed his three previous policies,
> nor did he ever have any actual knowledge of the true nature of the
> coverage provided under the 2002 Policies. Under these circumstances,
> it is possible that an Alabama state court would find that [Dr.] Brawley's
> reliance on [Mr.] Kerr's added assurances about the 2002 Policies was
> reasonable, despite his failure to read the policies.

(Doc. 18 at 5-6 ¶ 6 (emphasis added)).

The problem with this argument is that the Alabama Supreme Court rendered

the *Potter* special-relationship exception inapplicable to the very type of fraud claims

asserted by Dr. Brawley here:

> Under those circumstances [in *Potter*], we concluded that there was
> evidence of a special relationship between the plaintiffs and their
> acknowledged real-estate agent, together with evidence indicating that
> the agent had employed an artifice at the closing that lulled the plaintiffs
> into a false sense of security as to the contents of a document the
> plaintiffs were unable to read. We reversed the summary judgment in
> favor of the real-estate agent and her company. The exception to the rule
> discussed in *Potter* does not apply in this case, however, because Smith

[, *i.e.*, the insured] and Jeffrey[, *i.e.*, the agent] do not have the kind of special relationship that was present between the plaintiffs and the defendant in *Potter*. Had Jeffrey been the minister and Smith the congregant, a different situation might exist, but that case is not presented here.

*AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1210 (Ala. 2008) (emphasis added).

While Dr. Brawley asserts that "it is possible that an Alabama state court would find that [his] reliance on [Mr.] Kerr's added assurances about the 2002 Policies was reasonable, despite his failure to read [them]" (doc. 18 at 6 ¶ 6), he offers no Alabama authority in which *AmerUs*'s holding has been distinguished and/or *Potter*'s holding has been applied to a fraud claim against an insurance agent.

Thus, the Court agrees with Northwestern that Dr. Brawley's fraud claims against Messrs. Kerr and Wright under the 2002 Policies are time-barred and that no exceptions possibly apply.[11] Further, in light of the foregoing limitations analysis, Northwestern has satisfied the fraudulent joinder standard as to these remaining fraud

---

[11] The Court alternatively agrees with Northwestern that, if Dr. Brawley's fraud claims against Messrs. Kerr and Wright under the 2002 Policies are not clearly time-barred, they are, nonetheless, impossible under Alabama law because he "had a duty to read his policies and his failure to do so negates as a matter of law the reasonable reliance element of his fraud claims." (Doc. 17 at 32); *see, e.g., Alfa Life Ins. Corp. v. Colza*, 159 So. 3d 1240, 1252 (Ala. 2014) ("As evidenced by this case and by *Foremost*'s other progeny, we have essentially held that it is almost never reasonable for an individual to ignore the contents of documents given him or her in association with a transaction."); *id.* ("Although the *Foremost* line of cases deals primarily with fraud claims, there is no reason this principle should not apply to other claims as well."); *AmerUs*, 5 So. 2d at 1216 ("We conclude that no reasonable person could read the policies and the cost-benefit statement and not be put on inquiry as to the existence of inconsistencies, thereby making reliance on Jeffrey's representations unreasonable as a matter of law.").

claims.

### C. Dr. Brawley's Remaining Negligence Claims against Messrs. Kerr and Wright under the 2002 Policies Are Either Time-Barred or Precluded on the Merits.

Northwestern similarly maintains that Dr. Brawley's negligence claims under the 2002 Policies against Messrs. Kerr and Wright are time-barred by a two-year statute of limitations period. (Doc. 17 at 29); *see also Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993) ("The statutory period of limitations for negligence and wantonness actions, found at Ala. Code 1975, § 6-2-38, is two years from the date the injury occurred.").

Concerning negligent training and supervision, Dr. Brawley relies upon Mr. Wright's actions that took place in 2002. Therefore, Northwestern contends that the limitations period for that count expired in 2004. (Doc. 17 at 29); *see also Booker v. United Am. Ins. Co.*, 700 So. 2d 1333, 1339 (Ala. 1997) (finding negligent or wanton supervision claim time-barred when latest negligent act took place in May 1991 and lawsuit was not filed until August 1993 "–over two years after [the plaintiffs'] claims accrued[.]"). Northwestern makes a similar untimeliness argument about Dr. Brawley's negligent procurement (and failure to notify)[12] count. (Doc. 17 at 30).

---

[12] Dr. Brawley and Northwestern do not ever separately analyze an alleged failure to notify as a claim independent from negligent procurement.

In support of these negligence claims, Dr. Brawley maintains that he was not "damaged by either act of negligence" until Northwestern finally denied his appeal on February 16, 2017. (Doc. 11 at 20).[13] The Court easily rejects Dr. Brawley's position as it pertains to his negligent training and supervision claim because it is directly counter to *Booker*. In particular, Dr. Brawley has made no effort to discount *Booker* or point to contrary Alabama authority regarding the accrual of a negligent training and supervision claim. Thus, because Dr. Brawley's negligent training claim under the 2002 Policies is stale, Northwestern has satisfied the fraudulent joinder standard as to that claim.

The limitations analysis of Dr. Brawley's negligent procurement count is less straightforward. Dr. Brawley alleges that he "advised [Mr.] Kerr . . . that he wished to obtain true 'own occupation' disability insurance coverage to protect him in the event that he became unable to perform the primary activity of his specialty." (Doc. 1-1 at 33 ¶ 72). Dr. Brawley further asserts that he "relied on the expertise and judgment of [Messrs.] Kerr, [and] Wright . . . in purchasing the type of disability coverage that he needed, and monitoring the status of the coverage, the carrier

---

[13] Dr. Brawley does not address the validity of his negligence claims in his reply brief. Instead, he refers back to his arguments made in his Remand Motion. (*See* Doc. 18 at 8-9 ¶ 9 ("Rather than waste the Court's time reiterating Section IV(B) of his Motion, which addressed the sufficiency of his negligence claims, [Dr.] Brawley adopts and incorporates by reference, as if fully set forth herein, the entirety of that argument, as it originally appeared in his Motion.")).

providing coverage, and the carrier's claim practices." *Id.*

Northwestern relies upon the Rule 12(b)(6) case of *Toffel v. Nationwide Mut. Ins. Co.*, No. 2:15-CV-01669-KOB, 2016 WL 4271837, at *1 (N.D. Ala. Aug. 15, 2016), to show that Dr. Brawley can establish no cause of action for negligent procurement against Messrs. Kerr and Wright due to its staleness. In *Toffel*, the district court summarized the accrual standard for negligent procurement:

> Under Alabama law, the statute of limitations applicable to negligence claims, including claims for negligent failure to procure insurance coverage, is two years. Ala. Code § 6-2-38; *Bush v. Ford Life Ins. Co.*, 682 So. 2d 46, 47 (Ala. 1996). The statute of limitations period for a negligent procurement claim begins "when a loss that would trigger liability under the policy occurs" and when the insurer notifies the insured that it will not honor his claim. *Id.*

2016 WL 4271837, at *6.

Against this legal backdrop, the *Toffel* court found the statute of limitations barred the negligent procurement claim, explaining:

> In the instant case, Nationwide informed Nineteenth Street Investments on July 19, 2007 that it would not honor its claim for the loss related to the car accident in the state court law suits against Nineteenth Street. In its July 19, 2007 letter to Nineteenth Street, Nationwide stated in clear terms: "[T]here is no coverage for The Nineteenth Street Investments, Inc. Therefore, Nationwide respectfully disclaims coverage for the claim submitted as the Nineteenth Street Investments, Inc."
>
> Thus, the cause of action for Nineteenth Street's negligent failure to procure insurance claim **accrued on July 19, 2007**, when Nationwide

<u>informed Nineteenth Street that it would not honor its claim</u>. The statute of limitations period for Nineteenth Street's negligent procurement claim **expired on July 19, 2009**, two years after the claim accrued. Consequently, when Trustee Andre Toffel filed the adversarial proceeding against the Defendants on September 6, 2013, his negligent procurement claim was untimely.

2016 WL 4271837, at *6-7 (emphasis by underlining added) (citation omitted).

Based upon the reasoning in *Toffel*, Northwestern contends that because it initially denied Dr. Brawley's disability claim on February 25, 2015, Dr. Brawley's negligent procurement claim expired on February 25, 2017, as a matter of law. (Doc. 17 at 30). Northwestern further maintains that the untimeliness of this claim is without any uncertainty such that the demanding fraudulent joinder standard applies to it.

However, factually absent from *Toffel* is any indication that the finality of the denial of that insurance claim was impacted by the claimant's right (and decision) to appeal. Also, the denial letter that appears in that record does not include any language regarding a right to appeal. *See Toffel*, No. 2:15-CV-1669-KOB, (Doc. 9-1 at 15-21) (N.D. Ala. Oct. 9, 2015).[14] Consequently, *Toffel* is inapposite and fails to persuade this Court that, on the facts presented here, no Alabama court would conclude anything but that Dr. Brawley's negligent procurement claim is stale.

---

[14] All page references to Doc. 9-1 of the *Toffel* case correspond with the Court's CM/ECF numbering system.

Moreover, when the accrual of Dr. Brawley's negligent procurement claim is measured by the date on which Northwestern first denied his appeal–December 23, 2015 (or any date after that)–then the Complaint flied in this action August 1, 2017 predates the applicable 2-year statute of limitations period (which expired at the earliest on December 23, 2017). While an Alabama court might ultimately agree with Northwestern's position that Dr. Brawley's negligent procurement claim accrued on the earlier date of February 25, 2015, despite his appeal, none of the cases that Northwestern cites establishes such an unambiguous holding under Alabama law. (*See* Doc. 18 at 7 ¶ 7 ("Even if the Court rejects that position, and finds that Brawley should have discovered the fraud prior to the final denial, it would nevertheless have been reasonable for [Dr.] Brawley to not suspect foul play until December 23, 2015, the date upon which Northwestern denied the appeal invited by its February 25, 2015 letter.")). Further, the Eleventh Circuit law on fraudulent joinder leaves no room for doubt that any state-law legal uncertainties are to be resolved in Dr. Brawley's favor. *See Pacheco*, 139 F.3d at 1380 ("[T]he district court must evaluate factual allegations in the light most favorable to the plaintiff and resolve any uncertainties about the applicable law in the plaintiff's favor."). Therefore, the Court rejects this portion of Northwestern's opposition of the Remand Motion.

However, Northwestern alternatively maintains that Dr. Brawley's tort claims

against Messrs. Kerr and Wright are non-cognizable because he had a duty to read his 2002 Policies under *Foremost* (and its progeny) and has admitted in his complaint that he never did. (Doc. 17 at 32); (*see* Doc. 1-1 at 12 ¶ 15 ("[Dr. Brawley] did not compare the exact language of the two new policies with that of the three previous policies.")).

Concerning Dr. Brawley's negligence claims more specifically, Northwestern states that his contributory negligence bars them all as a matter of law:

> This same principle negates [Dr. Brawley]'s negligence claims. [Dr. Brawley]'s failure to read the policies he received renders him contributorily negligent, barring his negligence claims against the resident defendants. *See, e.g., Liberty Corp. Capital Ltd. v. Club Exclusive, Inc.*, No. 1:16-CV-791-VEH, 2016 WL 6157772, at *2–3 (N.D. Ala. Oct. 24, 2016) (Hopkins, J.) (holding "as a matter of law that [Plaintiff] had a duty to read the policy and therefore cannot recover on its negligent procurement of insurance claims"). This Court agrees and has dismissed negligent procurement claims on this same basis. *See Brown v. State Farm Fire & Casualty Co.*, No. 1:16-cv-1390-VEH, 2017 WL 492992 (N.D. Ala. Feb. 2, 2017) (Hopkins, J.) (holding that "judgment as a matter of law in favor of an agent is required 'when documents available to the insured clearly indicate that the insurance in fact procured for the insured is not what the insured subsequently claims he or she requested the agent to procure") (quoting *Alfa*, 159 So. 3d at 1253). [Dr. Brawley] admits that he received his policies. (Doc. 1-1, ¶ 15, Ex. A). Had he read them, he could have easily discovered the scope of his own occupation coverage and, as he admits, compared the language of his 2002 policies to that of his prior policies.

> In his motion to remand, [Dr. Brawley] does very little to address these deficiencies. (Doc. 11 at 22). In fact, instead of attempting to distinguish *Colza*, *Smith*, *Club Exclusive*, and *Brown*, [Dr. Brawley]

again falls back on his argument that an "ambiguity prevented Brawley from discovering the full scope of coverage." (Doc. 11 at 22). Yet [Dr. Brawley] does not cite a single case in which a court has reached the holding he urges this Court to make (*i.e.* that the Policies did not "clearly indicate" the scope of coverage). Moreover, the case he cites to argue that the Policies are ambiguous does not even employ the same language. Here, [Dr. Brawley] admits receiving the Policies, which specifically set forth the definition for "Total Disability." If [Dr. Brawley] did not understand what the term "principal duties" meant, then he should have exercised the free look provision set forth on the first page of the Policy and received a full refund from Northwestern. [Dr. Brawley] failed to do so. Given that [Dr. Brawley] received the Policies, had a duty to read them, and elected to keep them for decades, [Dr. Brawley]'s negligence claims against [Messrs.] Wright and Kerr are barred as a matter of law by his contributory negligence.

(Doc. 17 at 33-34).

The Court is persuaded by Northwestern's alternative position (that includes several decisions by the undersigned) and finds that Dr. Brawley has no possible negligent procurement claim under the 2002 Policies in light of his own negligent failure to read them. *See Brown*, 2017 WL 492992, at *7, *11 (finding that insured's contributory negligence in not reading policy prevents recovery on negligent procurement claim as a matter of law and ultimately finding the presence of fraudulent joinder as to all claims asserted against the insurance agent). The same is true of Dr. Brawley's failure-to-notify claim to the extent that he has asserted it as an independent act of negligence–Dr. Brawley's contributory negligence bars it as a matter of law. Consequently, Northwestern has satisfied the fraudulent joinder

standard as to Dr. Brawley's remaining negligence claims against Messrs. Kerr and Wright under the 2002 Policies.

## V.    Conclusion

Therefore, as explained above, Northwestern has clearly and convincingly satisfied the fraudulent joinder standard. Consequently, disregarding the Alabama citizenship of Messrs. Kerr and Wright is appropriate and exercising diversity jurisdiction over this removed action is proper. Accordingly, Dr. Brawley's Remand Motion is **DENIED**.

Further, for the same reasons set out in this opinion, Dr. Brawley has no possible claims against Messrs. Kerr and Wright. Accordingly, their Dismissal Motion is **GRANTED** and Messrs. Kerr and Wright are **HEREBY DISMISSED WITHOUT PREJUDICE** from this action.[15] The Clerk of the Court is further

---

[15] To the extent that Messrs. Kerr and Wright have requested a with-prejudice dismissal, that portion of their Dismissal Motion is **DENIED** for two reasons. (Doc. 8 at 7). First, they have not cited to a binding Eleventh Circuit decision that establishes their right to a with-prejudice dismissal based upon fraudulent joinder. *Cf. Miller Brewing*, 663 F.2d at 550) ("We believe that jurisdictional inquiry [of fraudulent joinder] <u>must not subsume substantive determination</u>.") (emphasis added). *But cf. Florence v. Crescent Res., LLC*, 484 F.3d 1293, 1296, 1299 (11th Cir. 2007) (acknowledging that purportedly fraudulently-joined party moved for a dismissal with prejudice which district court granted, but ultimately reversing jurisdictional determination as erroneous, vacating all judgments, and remanding consolidated cases to district court for return to state court). Second, this Court customarily treats a dismissal based upon fraudulent joinder as a non-merits-based one. (*See, e.g., Brown*, 2017 WL 492992, at *11 (granting fraudulently-joined party's motion to dismiss filed pursuant to Rule 12(b)(6), but dismissing that party without prejudice)); *see also Fowler*, 256 F. Supp. 2d at 1249 (dismissing fraudulently-joined defendant without prejudice).

**HEREBY DIRECTED** to terminate Messrs. Kerr and Wright as party defendants.

**DONE** and **ORDERED** this the 21st day of December, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge